```
UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND
- - - - - - - - - - - - - - - - -x
In re:                            :

ANTHONY J. BOLOGNESE              :    BK No. 06-11283
          Debtor                        Chapter 7
                                  :
THOMAS L. BYERS and RENEE C. BYERS
          Plaintiffs              :
v.                                     A.P. No. 07-1008
                                  :
ANTHONY J. BOLOGNESE
          Defendant
- - - - - - - - - - - - - - - - -x
```

## DECISION AND ORDER DETERMINING
## § 523(a)2(A) DEBT PARTIALLY NONDISCHARGEABLE

APPEARANCES:

    Americo M. Scungio, Esq.
    Attorney for Plaintiffs
    SCUNGIO and PRIOLO
    167 Main Street
    Westerly, Rhode Island 02891

    Christopher M. Lefebvre, Esq.
    Attorney for Defendant
    LAW OFFICE OF CLAUDE LEFEBVRE & SONS
    P.O. Box 479
    Two Dexter Street
    Pawtucket, Rhode Island 02862

**BEFORE ARTHUR N. VOTOLATO, United States Bankruptcy Judge**

BK No. 06-11283; A.P. No. 07-1008

Renee and Thomas Byers ("Plaintiffs"), the Debtor's sister and brother-in-law, seek a determination that their claim against him be declared nondischargeable under 11 U.S.C. § 523(a)(2)(A). Plaintiffs allege that they were induced to lend money to the Debtor based on his representation that he would use certain of the loan proceeds only for the specific purposes authorized in a written agreement between the parties. (Plaintiffs' Exhibit 1, the "Co-Sign Contract.")

The Debtor tried his case on the premise, and now argues, that for this debt to be held nondischargeable the Plaintiffs must prove that at the time he obtained their guaranty the Debtor willfully and/or maliciously intended to cause financial harm to his sister and brother-in-law.[1]  The Debtor's argument is more appropriate where a complaint is brought under Section 523(a)(6) (wilful and malicious injury), and is not the test in this case.  With that said, I will supplement the Plaintiffs' arguments, which are adopted and incorporated herein by reference, as follows:

---

[1] That Renee Byers conceded in cross examination that she did not believe that her brother lied and/or intended to cause her and her husband financial harm when the agreement was made, is not a defense to this complaint.  In fact, her testimony reinforces the Plaintiffs' reliance on the Debtor's representations.

1

BK No. 06-11283; A.P. No. 07-1008

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In February 2005, the Debtor was trying to acquire a franchise/dealership featuring the sale and maintenance of Suzuki motorcycles and accessories. Because he was unable on his own to obtain financing, the Debtor turned to his sister and brother-in-law for help, and they agreed to guarantee a $50,000 loan to assist in his business venture. It turned out, however, that much more than $50,000 was required to even be considered for a Suzuki franchise, so the Debtor asked the Plaintiffs to guarantee a $200,000 line of credit with his lender, Coastway Credit Union. The Plaintiffs both testified that they were persuaded to increase their exposure from $50,000 to $200,000 only because the additional $150,000 would be earmarked for two specific purposes. From this negotiation, the Debtor drafted the so-called Co-Sign Contract, memorializing the parties' agreement. See Plaintiff's Exhibit I.

The Co-Sign Contract, which provided, inter alia, that the Plaintiffs would guarantee the Debtor's $200,000 line of credit,[2] in its most pertinent part provides:

> The use of the line of credit by the Borrowers are intended for the following:

---

[2] To secure the guarantee, the Plaintiffs were also required to provide Coastway with a mortgage on their home. *See* Plaintiff's Exhibit F.

2

    a.    $100,000 LoC to meet the requirements of a Suzuki Dealership License for the motorcycle store the Borrowers are opening. This line of credit is required by Suzuki to ensure that the Borrowers have the ability to pay for any un-sold motorcycles after 18 months from the date of the first delivery.

    b.    $50,000 LoC to meet the requirements for the State of RI Motor Vehicle Dealership License.

    C.    $50,000 for any other unforseen start up costs or expenses or for working cash as Borrowers open and begin to operate their motorcycle store.

Plaintiff's Exhibit I, p.1. The agreement also required that if the Debtor wished to use any of the earmarked funds for a purpose other than as limited by Paragraphs a and b, he would need to give prior notice to the Plaintiffs, and provide vehicle identification numbers for any motorcycles purchased under the (guaranteed) line of credit. *See* Exhibit I, p.2, ¶7.[3] And if a financed motorcycle were[4] sold, the Debtor was supposed to pay down the line of credit by the cost of the vehicle, plus accrued interest, to reduce the

---

[3] Because the Debtor acquired no Suzuki vehicles, this provision never became operative.

[4] This is phrased in hypothetical terms because the Debtor so grossly mismanaged the start up operation that the franchise was never acquired, and not a single Suzuki motorcycle was sold.

BK No. 06-11283; A.P. No. 07-1008

Plaintiffs' liability under their guaranty.  *See* Exhibit I, p.2, ¶8.[5]

It is clear to the Court that only after, and as the result of specific negotiation, the Co-Sign Agreement was drafted to give the Plaintiffs an acceptable level of comfort to go forward, and that is why they agreed to guarantee a $200,000 line of credit, rather than the $50,000 to which they were originally willing to commit. The Plaintiffs testified that they felt protected because the Debtor was required to apply $100,000 to acquire the franchise and to purchase motorcycles which, when sold, would generate proceeds to replenish the draw against the Coastway line of credit.  They also felt secure as to the additional $50,000, because it was earmarked to purchase the State of Rhode Island dealer license.[6]

While the agreement specifically prescribes the use of $150,000, the Debtor testified, with absolutely no credibility,

---

[5] In return for their guaranty, the Plaintiffs were to receive interest at 15% per annum on the total amount of the guaranty. *See* Exhibit I, p.1, ¶5.  The Plaintiffs received no payments under the Agreement, they paid Coastway $240,205 as a result of the Debtor's default.

[6] By not immediately using the earmarked $50,000 to secure the Rhode Island Dealer's License, the Debtor effectively precluded the business from ever acquiring the right to sell Suzuki motorcycles, which he described as the most important part of the business – an undisclosed default that was fatal to the success of the business venture.

4

BK No. 06-11283; A.P. No. 07-1008

that he did not understand there were any limitations on his use of that fund, and I find that his testimony on the subject is nonsense.  The Debtor's demeanor, the contradictions in his testimony, and the Debtor's ludicrous version of his alleged understanding of the Co-Sign Contract *which he drafted*, support this Court's finding that all of the Debtor's relevant testimony is false, and that every contested issue of fact should be and is resolved against him.

>   Section 523(a)(2)(A) excepts from discharge any debt:
>
>   (2) for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by -
>   (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's ... financial condition[.]

11 U.S.C. § 523(a)(2)(A).

To prevail under § 523(a)(2)(A), the Plaintiffs must show by a preponderance of the evidence:[7] (1) that the Debtor made false representations; (2) with the intent to defraud; (3)  that the Plaintiffs were induced to and did rely on said false representations; (4) that the Plaintiffs' reliance was justifiable; and (5) that the Plaintiffs sustained pecuniary loss. *McCrory v.*

---

[7] *See Grogan v. Garner,* 498 U.S. 279 (1991) (preponderance of the evidence is the standard applied when seeking to establish an exception to discharge under § 523(a)(2)(A)).

5

BK No. 06-11283; A.P. No. 07-1008

*Spigel (In re Spigel),* 260 F.3d 27, 32 (1st Cir. 2001), *citing Palmacci v. Umpierrez,* 121 F.3d 781, 786-87 (1st Cir. 1997).

To establish the first two elements, the Plaintiffs must show that when the parties entered into their agreement, the Debtor did not intend to perform as promised, *Palmacci,* 121 F.3d at 787, and in examining the Debtor's intent, courts are permitted to look at the totality of the circumstances. *Id.* at 788-89; *Williamson v. Busconi*, 87 F.3d 602, 603 (1st Cir. 1996)("subsequent conduct may reflect back to the promisor's state of mind and thus may be considered in ascertaining whether there was fraudulent intent at the time the promise was made . . ."). The Co-Sign Contract, which was drafted solely by the Debtor, provided in very understandable terms that he would have the use of $50,000 for start up and ordinary business expenses, and that the balance of the line of credit was restricted as aforesaid. From the outset, however, the Debtor's conduct starkly reveals that he could not have reasonably intended to limit his use of the funds in his possession to $50,000. As the sole architect of the business plan, the Debtor knew that he had to completely renovate a 30,000 square-foot former supermarket building into a Suzuki dealer show room and maintenance facility, purchase inventory, and pay all the expenses of getting the business started, including advertising, insurance, utilities,

6

BK No. 06-11283; A.P. No. 07-1008

salaries, taxes, etc.  The Debtor is, and the Plaintiffs are not, charged with knowledge that the start up expenses had to be far in excess of the $50,000 permitted under the Contract, and the clearest proof of this is by looking at what happened from the word *go* – i.e., within eight weeks of obtaining the line of credit, and with no notice to the Plaintiffs, the Debtor had blown through nearly the entire $200,000, and none of the money earmarked for the acquisition of the Suzuki franchise or for the State dealer's license was used for either of those critical purposes.  *See* Plaintiff's Exhibit K, Loan History.  And while he was in the process of depleting the line of credit, the Debtor grossly misrepresented the status of the start up operation, by repeatedly assuring the Plaintiffs that things were going swimmingly with Suzuki.  *Harmon v. Kobrin(In re Harmon)*, 250 F.3d 1240, 1246 n.4 (9th Cir. 2001) ("failure to disclose material facts constitutes a fraudulent omission under § 523(a)(2)(A)").  It was not until late October 2005, after all the money was gone, that the Debtor finally informed the Plaintiffs that the business had failed.  So much for the Debtor's intent.

The Plaintiffs must also show 'justifiable reliance.'  Given the Supreme Court and First Circuit precedent on the subject, this burden is easily met, *Aoki v. Atto Corp. (In re Aoki)*, 323 B.R.

7

BK No. 06-11283; A.P. No. 07-1008

803, 816 (B.A.P. 1st Cir. 2005), since it is not even required that they "acted with ordinary prudence and care." *See Sanford Inst. for Sav. v. Gallo*, 156 F.3d 71, 75 (1st Cir. 1998). In fact, justifiable reliance on a misrepresentation may be established even when an investigation is not conducted to establish its falsity. *Id.*

Because of the Plaintiffs' familial relationship and their level of trust in the Debtor, plus his ability to satisfy them that the business plan would be adhered to, the Plaintiffs' reliance in this case was justifiable. *Field v. Mans,* 516 U.S. 59 (1995) (circumstances surrounding the reliance are considered when determining whether they are 'justifiable'). Here, the Plaintiffs were entitled to rely on the Debtor's representations, in the absence of warning signs to the contrary. *Id.* The Plaintiffs testified that early on they visited the business regularly on weekends, and saw no reason to suspect that the Debtor was drawing against the (protected) line of credit. The ruse continued until October 2005, and by then the money was gone. The testimony of the Plaintiffs is credible and it is accepted as true.

It is undisputed that the Debtor was authorized to use $50,000 for working capital for Cycle Brothers, LLC, and therefore that amount is discharged. As to the balance of their claim, the

8

BK No. 06-11283; A.P. No. 07-1008

Plaintiffs have established all of the elements of a case brought under § 523(a)(2)(A). Accordingly, all moneys guaranteed and/or paid by them in excess of $50,000 is determined to be nondischargeable.

Enter judgment in accordance with this decision.

Dated at Providence, Rhode Island, this 13th day of February, 2008.

_____
Arthur N. Votolato
U.S. Bankruptcy Judge

Entered on docket: 2/13/08

9